158 F.3d 1022
 98 Cal. Daily Op. Serv. 7838, 98 Daily Journal
D.A.R. 10,902
Kathy MONTEIRO, individually, as the legal guardian of her
minor daughter Jane Doe, and on behalf of all
other similarly situated individuals,
Plaintiff-Appellant,
v.
THE TEMPE UNION HIGH SCHOOL DISTRICT, a political
subdivision of the State of Arizona, and Daniel Perkins,
Randy Clawson, Richard Foreman and Steven Rich, individually
and in their official capacities as members of the Governing
Board of the Tempe Union High School District, Defendants-Appellees.
 No. 97-15511.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 11, 1998.
Decided Oct. 19, 1998.
 
 Stephen G. Montoya, Phoenix, Arizona, for plaintiff-appellant.
 Alison Lewis, Teilborg, Sanders & Parks, Phoenix, Arizona, for defendants-appellees.
 Appeal from the United States District Court for the District of Arizona; Stephen M. McNamee, District Judge, Presiding. D.C. No. CV-96-01236-SMM.
 Before: D.W. NELSON, BOOCHEVER, and REINHARDT, Circuit Judges.
 Opinion by Judge REINHARDT; Concurrence by Judge BOOCHEVER.
 REINHARDT, Circuit Judge:
 
 
 1
 More and more frequently we are faced with cases in which two fundamental constitutional rights appear to be at odds. At such times, the job of federal judges is particularly difficult. Here, we confront a case presenting some elements of such a clash. The setting is a freshman English class in Tempe, Arizona, and the competing interests are the First Amendment rights of high school students to receive information or ideas--even when contained in literary works that may in today's world appear to have racist overtones--and the rights of those same students to receive a public education that neither fosters nor acquiesces in a racially hostile environment.
 
 
 2
 Jane Doe was a student in a freshman English class at McClintock High School, which is part of the defendant Tempe Unified Union High School District ("School District"). The class' required reading included two classic literary works--the novel The Adventures of Huckleberry Finn, by Mark Twain, and the short story A Rose for Emily, by William Faulkner. The complaint, brought on Doe's behalf by her mother, Kathy Monteiro, alleged that each of these literary works "contains repeated use of the profane, insulting and racially derogatory term 'nigger.' " It also alleged that neither work is a necessary component of a freshman English class and that none of the assignments in the curriculum refers to Caucasians in a derogatory manner.
 
 
 3
 According to the complaint, Doe and other similarly situated African-American students suffered psychological injuries and lost educational opportunities due to the required reading of the literary works. The complaint alleged that the School District had notice that Doe suffered these injuries but refused to offer a remedy other than to allow her to study alone in the library while the works were being discussed in class. It further alleged that the assignment of the literary works "created and contributed to a racially hostile educational environment," including increased racial harassment by other students. Finally, it alleged that by its conduct the School District intentionally discriminated against Doe.
 
 
 4
 In her complaint, Monteiro sought a declaratory judgment, urging that the conduct of the School District violated Doe's rights under the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964. She also requested a temporary and permanent injunction "prohibiting [the defendants] from committing similar unlawful acts in the future." Monteiro did not, however, seek the exclusion of the literary works from a voluntary reading list
 
 
 5
 or from inclusion in classroom discussions in which Jane Doe and other African American students [are] not held as a captive student audience or consigned to a separate and unequal educational environment.
 
 
 6
 Finally, she requested compensatory monetary damages, equitable relief in the form of compensatory education, and attorney fees.
 
 
 7
 In a memorandum order filed January 2, 1997, the district court dismissed the complaint on the ground that Doe failed to state a claim under either the Equal Protection Clause or Title VI because the complaint did not contain specific allegations of fact necessary to sustain a claim of discriminatory intent. The district court also dismissed as moot Monteiro's request for injunctive relief "regarding removal of the literary works from particular English classes" because Doe was no longer a member of the freshman English class and ruled that the case was not proper for class certification because of the absence of any showing that certification under Fed.R.Civ.P. 23 would be proper.[1] The order did not specify whether the dismissal was with prejudice. On that same day, however, the district court entered judgment dismissing the complaint and the action.
 
 
 8
 Monteiro moved for a new trial pursuant to Fed.R.Civ.P. 59(a) on the ground that the dismissal was improper in light of the complaint's good faith allegations that the School District acted with the requisite discriminatory intent. As an exhibit to the motion Monteiro attached a proposed amended complaint (the "amended complaint") in order to set forth her hostile educational environment claim "with more specificity." The memorandum in support of the motion requested that the court "grant plaintiff a new trial by vacating its summary judgment of January 2, 1997, and allowing plaintiff to proceed with her proposed amended complaint."
 
 
 9
 The amended complaint reiterates the contentions made in the initial complaint and seeks the same relief. It contains additional allegations, however, regarding the hostile racial environment at the school and the notice afforded the District of the complained-of conduct. It alleges with more particularity that Doe and other African-American students were subjected to racial harassment, orally and by the use of graffiti, prior to the time the literary works were introduced into the classroom, and that such harassment increased as a result of the assignment of those works as required reading. In particular, it alleges that African-American students were called "nigger" by their white peers with increased frequency and intensity after the literary works were assigned. Finally, it alleges that the school district, when notified of incidents of racial harassment, refused to accept the complaints or to take any appropriate remedial measures regarding them.
 
 
 10
 The district court denied the motion. It first noted that the purpose of a motion for reconsideration is to correct "manifest errors of law or fact or to present newly discovered evidence." It then rejected the amended complaint:
 
 
 11
 Plaintiff argues that the Court rejected Plaintiff's allegations of discriminatory intent and hostile educational environment. The Court noted in its Order that Plaintiff's Amended Complaint contained numerous legal conclusions. For instance, the Court acknowledged that Plaintiff alleged, in a conclusory fashion, that Defendants acted "with discriminatory intent." Nonetheless, Plaintiff's Amended Complaint alleged no factual allegations which support the proposition that Defendants intentionally discriminated against Plaintiff. Moreover, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss. Therefore, accepting Plaintiff's allegations as true, Plaintiff's allegations nevertheless fail as a matter of law.
 
 
 12
 Order filed February 4, 1997 (citation omitted).[2]
 
 
 13
 Monteiro now appeals the orders dismissing the complaint and denying the motion for a new trial. In doing so, she essentially challenges the district court's dismissal of her amended complaint.
 
 I.
 
 14
 We first resolve several procedural issues pertaining to the judge's dismissal of the original complaint and to his entry of judgment dismissing the action. The district court entered judgment the very same day that it granted the District's motion to dismiss the original complaint. Fed.R.Civ.P. 15, however, provides that "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served." Because Monteiro had not yet amended her complaint, and because there had been no answer filed, the district court erred when it did not give Monteiro the opportunity to file an amendment but instead entered judgment dismissing the action.
 
 
 15
 Instead of amending her complaint, as would have been the appropriate course of action under ordinary circumstances, Monteiro attached the amended complaint to her motion for reconsideration and sought to have her action reinstated in light of its contents. The district court denied her motion on the ground that the amended complaint failed to state a claim as a matter of law. Because under Fed.R.Civ.P. 15, Monteiro should have been permitted to file an amended complaint and because the district court determined that the amended complaint could not survive a motion to dismiss, and on that basis refused to reinstate her action, we will consider on the merits the district court's ruling that the amended complaint failed to state a claim.
 
 II.
 
 16
 Monteiro's amended complaint alleges violations of the Equal Protection clause and Title VI of the Civil Rights Act of 1964.[3] We have held that § 1983 claims based on Equal Protection violations must plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent. See De La Cruz v. Tormey, 582 F.2d 45, 58 (9th Cir.1978), cert. denied, 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979); see also Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (requiring showing of intentional discrimination). Under Title VI, however, we have required only that the complaint allege that the defendant is engaging in discrimination, although a showing of intent is necessary at trial. Fobbs v. Holy Cross Health Sys., 29 F.3d 1439, 1447 (9th Cir.1994), cert. denied, 513 U.S. 1127, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995). Because Monteiro pled intent as to Equal Protection and did not need to do so as to Title VI, it was error for the district court to dismiss for failure to plead intent. We nevertheless consider whether any other ground exists on which the district court's action should be affirmed.[4]
 
 
 17
 The amended complaint requests relief on the basis of two distinct acts, or rather failures to act, on the part of the District. The first involves the District's assignment of the two disputed literary works as mandatory reading, and its subsequent refusal to remove them from that part of the curriculum. The second involves the District's refusal to take action in response to complaints by Doe and other African-American students regarding incidents of racial harassment at the school. Each incorporates the facts that underlie the other. We will address the two distinct claims in turn.
 
 
 18
 A. Assignment of and Failure to Remove the Literary Works
 
 
 19
 A significant portion of the amended complaint, like the original, is based on the District's assignment of Huckleberry Finn and A Rose for Emily as required reading and its subsequent refusal to remove them from the mandatory curriculum. In addition to seeking removal, Monteiro's amended complaint seeks monetary damages as a result of the past assignment of the literary works and an injunction preventing the school from "committing similar unlawful acts in the future." We consider here whether the District's conduct, the requirement that students read books that were determined by the appropriate school authorities to have educational value, and the refusal to remove those books from a mandatory curriculum, can form the basis for a complaint alleging discriminatory conduct under the Equal Protection Clause and Title VI.
 
 
 20
 We approach this question in light of a number of considerations. The first is the threat to First Amendment freedoms posed by efforts to prevent school boards from assigning the reading of literary works on the ground that individuals or groups may find the contents injurious or offensive. The second is the broad discretion afforded school boards to establish curricula they believe to be appropriate to the educational needs of their students. The third is the awareness that words can hurt, particularly in the case of children, and that words of a racist nature can hurt especially severely. The fourth is the knowledge that the historic prejudice against African-Americans that has existed in this nation since its inception has not yet been eradicated--by any means. The fifth is the requirement that young African-Americans, like all students, be afforded a public education free from racially discriminatory conduct on the part of educational authorities.
 
 
 21
 The Supreme Court has addressed on a number of occasions the balancing of a school's discretion in determining educational matters with a students' First Amendment rights. See, e.g., Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 268-69, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (holding that school board regulation of curriculum-related speech does not raise First Amendment concerns if regulation is "reasonably related to legitimate pedagogical concerns"); Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (holding that punishment of student's "lewd speech" at assembly does not constitute violation); Board of Educ., Island Trees Union Free Sch. Dist. v. Pico, 457 U.S. 853, 866, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (plurality opinion) (holding that students' First Amendment right of access to information is violated when schools remove books from library in content-based manner).[5] In doing so, the Court has recognized that school boards generally retain a broad discretion in managing school affairs, Kuhlmeier, 484 U.S. at 272, 108 S.Ct. 562; Pico, 457 U.S. at 864, 102 S.Ct. 2799 (agreeing with proposition that local school boards may establish and apply their curricula such a way as to transmit community values); see also Virgil v. School Bd. of Columbia County, Florida, 862 F.2d 1517, 1520 (11th Cir.1989) (reviewing cases), but it has also consistently noted that the school board's discretion "in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." Pico, 457 U.S. at 864, 102 S.Ct. 2799 (discussing West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (compelling students to salute flag violates First Amendment) and Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (striking down state law prohibiting teaching of evolution)). See generally Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (finding that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate").
 
 
 22
 Unlike the cases cited above, the case before us does not involve an action taken by a school board that arguably abridges the First Amendment rights of its students. Instead, it is a third party, a parent or a class of parents, that seeks to limit the educational materials the school officials may furnish to the students--and require them to read. Here we consider whether the school board's interest in exercising its broad discretion in assigning the literary works in question and the students' First Amendment interest in reading those works are collectively outweighed by the constitutional and statutory interests of students who assert that they are injured by the mandatory assignments. To resolve this controversy, we must consider whether the assignment of material deemed to have educational value by school authorities may in itself serve as the basis for an injunction by a court or an award of damages, when the challenge to the material is founded on its message or the language it employs.[6] In other words, may courts ban books or other literary works from school curricula on the basis of their content? We answer that question in the negative, even when the works are accused of being racist in whole or in part.
 
 
 23
 To begin with, Monteiro's amended complaint--and other lawsuits threatening to attach civil liability on the basis of the assignment of a book--would severely restrict a student's right to receive material that his school board or other educational authority determines to be of legitimate educational value. The amended complaint requests, under the threat of civil liability, that the school remove the literary works from the classroom.[7] Certainly when a school board identifies information that it believes to be a useful part of a student's education, that student has the right to receive the information. Indeed, the Eighth Circuit has concluded that a school board's removal of material from the classroom curriculum solely on the basis of its message has a powerful symbolic effect on a student or teacher's First Amendment rights--despite the material's availability in the library--and is, therefore, unconstitutional. See Pratt v. Independent Sch. Dist. No. 831, Forest Lake, Minn., 670 F.2d 771, 773 (8th Cir.1982) (finding removal of a film, Shirley Jackson's The Lottery, constitutionally impermissible when action was premised on "assumption that scenes offensive to the majority of the board and some parents had no place ... in the school system").[8] Because ours is not a case in which a school board has decided on the basis of its own evaluations to remove literary materials, we need not now decide the question resolved by the Eighth Circuit. We have no hesitation in concluding, however, that a student's First Amendment rights are infringed when books that have been determined by the school district to have legitimate educational value are removed from a mandatory reading list because of threats of damages, lawsuits, or other forms of retaliation. In this case, the relief that Monteiro's complaint seeks, injunctive relief as well as monetary damages, would unquestionably restrict the students' First Amendment freedoms and significantly interfere with the District's discretion to determine the composition of its curriculum.
 
 
 24
 There is an even more serious consequence for McClintock High School, as well as for all schools, that would flow from allowing the judicial system to process complaints that seek to enjoin or attach civil liability to a school district's assignment of a book. As the Supreme Court has recognized, at least since New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), complaints based on speech protected by the First Amendment have far-ranging and deleterious effects, and the mere threat of civil liability can cause potential defendants to " 'steer far wider of the unlawful zone.' " 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (quoting Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)).[9] Were the plaintiff to succeed in this litigation or even to succeed in forcing the defendants to engage in a trial over such well-established literary works, the threat of future litigation would inevitably lead many school districts to "buy their peace" by avoiding the use of books or other materials that express messages--or simply use terms--that could be argued to cause harm to a group of students.
 
 
 25
 It is not surprising that this conflict arises over Huckleberry Finn. According to the American Library Association, Twain's slim volume describing the effects of racism and slavery in antebellum society is the most frequently banned book in the United States, as well as one of the nation's most respected literary works. Black parents all over the country have asserted, as does Monteiro, that the book's use of the word "nigger" some 215 times "has a negative effect on the self-esteem of young black students" and that it therefore "has no place in the classroom." See Dan Cryer, Why Is Huck So Controversial?, Newsday, Oct. 15, 1996, at A33. Recent years have seen efforts to remove the work from libraries and reading lists in school districts in a number of states, including Pennsylvania, Ohio, and California, as well as Arizona. Although some districts voted to retain the book, many others have removed it from the curriculum due to concerns about the use of racial stereotypes and epithets.
 
 
 26
 There is, of course, an extremely wide--if not unlimited--range of literary products that might be considered injurious or offensive, particularly when one considers that high school students frequently take Advanced Placement courses that are equivalent to college-level courses.[10] White plaintiffs could seek to remove books by Toni Morrison, Maya Angelou, and other prominent Black authors on the ground that they portray Caucasians in a derogatory fashion;[11] Jews might try to impose civil liability for the teachings of Shakespeare and of more modern English poets where writings exhibit a similar anti-Semitic strain. Female students could attempt to make a case for damages for the assignment of some of the works of Tennessee Williams, Hemingway, or Freud, and male students for the writings of Andrea Dworkin or Margaret Atwood.[12] The number of potential lawsuits that could arise from the highly varied educational curricula throughout the nation might well be unlimited and unpredictable. Many school districts would undoubtedly prefer to "steer far" from any controversial book and instead substitute "safe" ones in order to reduce the possibility of civil liability and the expensive and time-consuming burdens of a lawsuit--even one having but a slight chance of success. In short, permitting lawsuits against school districts on the basis of the content of literary works to proceed past the complaint stage could have a significant chilling effect on a school district's willingness to assign books with themes, characters, snippets of dialogue, or words that might offend the sensibilities of any number of persons or groups.
 
 
 27
 Further, any school board attempting to remove books from its curriculum on the ground that the works might offend would likely be vulnerable to First Amendment actions brought by students desiring to study those books, and possibly teachers, as well.[13] Schools could be caught between those seeking to remove Huckleberry Finn and those seeking to study it. It would clearly not be in the best interests of our public education system and its students to have such competing lawsuits become a part of our legal landscape.
 
 
 28
 The number and range of books that might become the subject of litigation must be considered in light of the fact that the literary works at issue here contained only one offensive term, albeit a most injurious one. Moreover, the term is one that was widely used in an earlier era, and that might well appear in any work of fiction attempting to portray life in those times with any accuracy. The amended complaint does not allege that the two literary works are otherwise offensive or that they in any other way convey racist or offensive messages. Nor does it contend that the curriculum itself was racist or that the manner in which the assigned books, or any other books, were taught caused injury to African-American students. To put it in the most elementary terms, it is the literary works, and only the literary works, that Monteiro seeks to put on trial in the principal portion of her complaint--and it is solely because of the recitation in those works of a once commonly used racial epithet that she seeks to do so. Monteiro's complaint indeed raises most serious First Amendment concerns.
 
 
 29
 Nevertheless, as we said at the outset, there are important countervailing considerations that also must be weighed. We are aware that books can hurt, and that words can hurt--particularly racist epithets. It is now uncontroversial to observe that some of the most lauded works of literature convey, explicitly or in a more subtle manner, messages of racism and sexism, or other ideas that if accepted blindly would serve to maintain or promote the invidious inequalities that exist in our world today. We also recognize that the younger a person is, the more likely it is that those messages will help form that person's thinking, and that the feelings of minority students, especially younger ones, are extremely vulnerable when it comes to books that are racist or have racist overtones. In addition, we acknowledge that we have all too often failed to afford our African-American citizens the equal treatment that the Fourteenth Amendment requires, particularly in the area of public education. Nevertheless, for our courts or even our school boards to prohibit the assignment of literary works that may in some respects be racially offensive is simply not the proper solution.
 
 
 30
 First, the fact that a student is required to read a book does not mean that he is being asked to agree with what is in it. It cannot be disputed that a necessary component of any education is learning to think critically about offensive ideas--without that ability one can do little to respond to them. Second, it is important for young people to learn about the past--and to discover both the good and the bad in our history.[14] Third, if all books with messages that might be deemed harmful were removed, the number of "acceptable" works might be highly limited. Because sexism and racism, and other forms of inequality, exist in almost every culture--and because our values tend to change and are not immutable--and because the dispute over what ideas are proper or improper will always be a matter of intense controversy--it would be folly to think that there is a certain "safe" set of books written by particular authors that all will find acceptable. Next, we reject the notion that putting books on trial in our courts is the proper way to determine the appropriateness of their use in the classroom. Such judgments are ordinarily best left to school boards and educational officials charged with educating young people and determining which education materials are appropriate for which students, and under what circumstances. Therefore, although we recognize that books--and words--are powerful tools that can convey extremely injurious messages, we conclude that the assignment of a literary work determined to have intrinsic educational value by the duly authorized school authorities cannot constitute the type of discriminatory conduct prohibited by the Fourteenth Amendment and Title VI, regardless of the fact that the work may be deemed to contain racist ideas or language.
 
 
 31
 We do not, of course, suggest that racist actions on the part of teachers implementing a curriculum could not comprise discriminatory conduct for the purposes of Title VI or the Fourteenth Amendment. Nor do we preclude the prosecution of actions alleging that schools have pursued policies that serve to promote racist attitudes among their students, or have sought to indoctrinate their young charges with racist concepts. We conclude only that allegations that a school required that a book be read, and then refused to remove it from the curriculum, fails to provide the basis for a claim of discrimination under the Equal Protection Clause or Title VI, even when the school district is also accused of a failure to take steps to remedy a hostile racial environment. It is simply not the role of courts to serve as literary censors or to make judgments as to whether reading particular books does students more harm than good.
 
 
 32
 We close this part of our discussion with two observations. First, we view with considerable skepticism charges that reading books causes evil conduct. It is all too easy to allege cause-and-effect when one event follows another. Here, for example, Monteiro alleges that racial harassment, including verbal insults, increased "as a result of" the assignment of Huckleberry Finn and A Rose for Emily. The "as a result" link is wholly unsupported by any factual allegations. If racial harassment indeed increased during the school term, there are many other more likely causes that all of the interested parties might do well to explore. Second, the function of books and other literary materials, as well as of education itself, is to stimulate thought, to explore ideas, to engender intellectual exchanges. Bad ideas should be countered with good ones, not banned by the courts. One of the roles of teachers is to guide students through the difficult process of becoming educated, to help them learn how to discriminate between good concepts and bad, to benefit from the errors society has made in the past, to improve their minds and characters. Those who choose the books and literature that will influence the minds and hearts of our nation's youth and those who teach young people in our schools bear an awesome responsibility. We can only encourage them to exercise their authority wisely and well, and to be sensitive to the needs and concerns of all of their students.
 
 
 33
 In light of the above, we affirm the district court's rejection of the amended complaint as it relates to the District's assignment of and refusal to remove the two literary works in question.
 
 B. Hostile Racial Educational Environment
 
 34
 The district court dismissed not only the claims relating to Huckleberry Finn and A Rose for Emily, but also Monteiro's claim that her daughter and others were subjected to a hostile racial educational environment because they were repeatedly called "nigger" and other racial slurs by white students. In addition, these insults were scrawled about the school in the form of graffiti. Monteiro further alleged in her amended complaint that her child as well as other students and parents complained to the appropriate authorities at McClintock High School and the school district but that the district refused to accept the complaints and furthermore refused to make any effort to halt the racist conduct. Ms. Monteiro asserts that this ordeal has "significantly hindered" her daughter's education and achievement. Because we find that the complaint sufficiently alleges a violation of Title VI, we reverse.
 
 
 35
 We are aware of no reported decision addressing the circumstances under which a school district's failure to respond to racial harassment of one or more pupils by other students constitutes a violation of Title VI. However, the Department of Education in 1994 interpreted Title VI as prohibiting student-to-student racial harassment and set out the criteria by which such claims are to be evaluated. Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance, 59 Fed.Reg. 11448 (March 10, 1994).
 
 
 36
 The Department of Education is the agency charged by Congress with enforcing Title VI. As such, its interpretation is entitled to a high degree of deference by the courts so long as it does not conflict with a clearly expressed congressional intent and it is reasonable. Chevron v. Natural Resources Defense Council, 467 U.S. 837, 844-45, 104 S.Ct. 2778, 81 L.Ed.2d 694; Williams v. Babbitt, 115 F.3d 657, 660 n. 3 (9th Cir.1997) (noting that Chevron deference is owed to agency interpretations made in adjudicative as well as regulatory context), cert. denied, --- U.S. ----, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998); Wilshire Westwood Assoc. v. Atlantic Richfield Corp., 881 F.2d 801, 810 (9th Cir.1989) (deferring to agency interpretation contained in memoranda published in the Federal Register and rejecting argument that Chevron applies only to regulations). Congress in drafting Title VI broadly proscribed racial discrimination in programs receiving federal monies. The term "discrimination" as used in Title VI is, of course, notoriously ambiguous, generating more than thirty years of litigation over its precise meaning. See Guardians Ass'n v. Civil Serv. Comm'n of the City of New York, 463 U.S. 582, 593, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (opinion of White, J., for the Court) ("The language of Title VI on its face is ambiguous; the word discrimination is inherently so."). Given this ambiguity, the Department of Education's interpretation is owed substantial deference. Moreover, the Investigative Guidance is consistent with analogous cases decided both in this circuit and others under Title VII and Title IX. See, e.g., Oona R.-S. v. McCaffrey, 1998 WL 216944, at * 4 (9th Cir.1998) (holding that allegations of student to student sexual harassment state a claim for violation of Title IX based on hostile environment), pet. for cert. filed, 67 U.S.L.W. 3083 (U.S. June 19, 1998) (No. 98-101).
 
 
 37
 According to the Department of Education, a school district violates Title VI when (1) there is a racially hostile environment; (2) the district had notice of the problem; and (3) it "failed to respond adequately to redress the racially hostile environment." 59 Fed.Reg. at 11449. The agency's publication expressly states that a hostile environment can be caused by the conduct of peers. "Under this analysis, an alleged harasser need not be an agent or employee of the recipient because this theory of liability under Title VI is premised on a recipient's general duty to provide a nondiscriminatory educational environment." Id. We take the three-part test set out by the Department of Education in its Interpretive Guidance as our framework for evaluating whether the district court erred in dismissing that part of Monteiro's amended complaint that relates to the hostile racial environment.
 
 1. Hostile Environment
 
 38
 The Department of Education defines a "racially hostile environment" as one in which racial harassment is "severe, pervasive or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the services, activities or privileges provided by the recipient." Id. at 11449. Whether a hostile educational environment exists is a question of fact, determined with reference to the totality of the circumstances, including the victim's race and age. Racial harassment creates a hostile environment if it is sufficiently severe that it would interfere with the educational program of a reasonable person of the same age and race as the victim. 59 Fed.Reg. 11449; see Ellison v. Brady, 924 F.2d 872 (9th Cir.1991) (holding that "reasonable person" in sexual harassment case brought by female plaintiff is a reasonable woman ). Moreover, racist attacks need not be directed at the complainant in order to create a hostile educational environment. 59 Fed.Reg. 11449-50. See also Patterson v. McLean Credit Union, 491 U.S. 164, 180, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (holding that racial harassment in the workplace is actionable under Title VII); Waltman v. International Paper Co., 875 F.2d 468, 477 (5th Cir.1989) (sexual graffiti not directed at plaintiff relevant to show hostile work environment under Title VII); Walker v. Ford Motor Co., 684 F.2d 1355 (11th Cir.1982) (evidence of racial harassment directed at others relevant to establish hostile work environment under Title VII).
 
 
 39
 In her amended complaint, Monteiro alleged that her ninth-grade daughter and other similarly situated African-American students attended a school where they were called "niggers" by white children, and where that term was written on the walls of the buildings in which they were supposed to learn civics and social studies. It does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from schooling as her white counterparts.
 
 
 40
 This is especially so when we also consider, in accordance with the agency's interpretation, the victim's age. Ninth grade is a sensitive time in a child's life. It is the beginning of high school, when a young adolescent is highly impressionable and is making decisions about education that will affect the course of her life. It is when college plans are often either begun or abandoned. As the Investigative Guidance notes, "verbal harassment of a young child by fellow students that is tolerated or condoned in any way by adult authority figures is likely to have a far greater impact than similar behavior would on an adult." 59 Fed.Reg. 11449. A school where this sort of conduct occurs unchecked is utterly failing in its mandate to provide a nondiscriminatory educational environment. Accordingly, we find that the complaint sets forth allegations that satisfy the first factor of the test for a Title VI violation.
 
 2. Notice
 
 41
 The second part of our inquiry focuses on whether the district had sufficient notice of the racially hostile environment at McClintock High. The Department of Education's interpretation provides that a district may have either actual or constructive notice of racial harassment. 59 Fed.Reg. 11450-51. Actual notice may occur, as in this case, when a student or parent makes a complaint about racially demeaning incidents to the appropriate educational authorities. Monteiro alleged that her daughter and other African-American children experienced a pattern of racial abuse at McClintock High, and that students and parents complained about it to administrators at the school and the district. We conclude, therefore, that the complaint sufficiently alleges that the district had notice of discrimination.
 
 3. The School's Response
 
 42
 Finally, we consider Monteiro's allegation that district officials refused to accept the complaints regarding racial problems at McClintock High School or to put a stop to the students' racist conduct. Once on notice of the problem, a school district "has a legal duty to take reasonable steps to eliminate" a racially hostile environment. 59 Fed.Reg. 11450. When a district is "deliberately indifferent" to its students' right to a learning environment free of racial hostility and discrimination, it is liable for damages under Title VI. Gebser v. Lago Vista Indep. Sch. Dist., --- U.S. ----, 118 S.Ct. 1989, 1999, 141 L.Ed.2d 277 (1998) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 388-92, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Under this standard, the district is liable for its failure to act if the need for intervention was so obvious, or if inaction was so likely to result in discrimination, that "it can be said to have been deliberately indifferent to the need." Canton, 489 U.S. at 390, 109 S.Ct. 1197. There can be no doubt that Ms. Monteiro's amended complaint alleges a pattern of egregious public racial harassment including the use of the epithet "nigger," that Black students and their parents complained but were rebuffed, and that nothing was ever done about the problem. It goes without saying that being called a "nigger" by your white peers (or hearing that term applied to your Black classmates) exposes Black children to a "risk of discrimination" that is so substantial and obvious that a failure to act can only be the result of deliberate indifference.
 
 
 43
 We conclude that the amended complaint sets forth allegations that satisfy all three parts of the test for a violation of Title VI based upon a hostile racial environment. In light of the holding set forth in part A, however, we reverse only as to those portions of the amended complaint relating to the incidents of racial harassment and not as to those portions relating to the assignment of Huckleberry Finn and A Rose for Emily or the refusal to remove those literary works from the mandatory assignment list.[15]
 
 
 44
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED for further proceedings consistent with this opinion.
 
 
 45
 BOOCHEVER, Circuit Judge, concurring.
 
 
 46
 I concur in the majority's opinion. I write separately, however, to emphasize that this case does not call upon us to evaluate a complaint alleging that a school board assigned as required reading books with overt messages of racial hatred, such as those promoting the views of the Aryan Nation, the Ku Klux Klan, or similar hate groups, and that teachers did not discuss the books. A complaint alleging that the adoption of such texts violated Title VI may well present different issues which we need not consider in this case.
 
 
 
 [1]
 Monteiro, however, had not yet moved for class certification
 
 
 [2]
 It appears that the first time the district court uses the term "Amended Complaint" it is discussing its order dismissing the initial complaint, and that the word "Amended" is included by mistake. The second time the court refers to the "Amended Complaint," however, it appears to do so correctly and to intend to hold that the amended complaint is inadequate
 
 
 [3]
 Title VI provides in relevant part:
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under and program or activity receiving Federal financial assistance.
 42 U.S.C. § 2000d.
 
 
 [4]
 We hasten to add that the ground we consider is one that the parties thoroughly briefed and argued
 
 
 [5]
 We find Pico to be particularly helpful in identifying the First Amendment interests that are involved in this case. Pico held that a school board could not remove books from a school library if it did so "in a narrowly partisan or political manner." 457 U.S. at 870-71, 102 S.Ct. 2799. It based its decision on two First Amendment principles that we find are also relevant in the context of a school curriculum. The first is the well-established rule that the right to receive information is an inherent corollary of the rights of free speech and press, because the right to distribute information necessarily protects the right to receive it. 457 U.S. at 866, 102 S.Ct. 2799; see Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both.") (right to receive advertising). The second involves the students' rights to receive a broad range of information so that they can freely form their own thoughts: "[m]ore importantly, the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." 457 U.S. at 867, 102 S.Ct. 2799 (emphasis added). The Supreme Court has long recognized that the freedom to receive ideas, and its relation to the freedom of expression, is particularly relevant in the classroom setting:
 The classroom is peculiarly "the marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection."
 Keyishian v. Board of Regents of Univ. of State of N.Y., 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (quoting United States v. Associated Press, 52 F.Supp. 362, 372 (S.D.N.Y.1943)).
 
 
 [6]
 We exclude from our holding and analysis educational material subject to the prohibitions of the Religion Clauses of the First Amendment. Those clauses have a long, checkered, and unique history in the evolution of our constitutional doctrine. Over the years, the courts have developed a set of principles designed especially to enforce the prohibition against state-established religion and to ensure the freedom of religious thought and expression of all individuals, including students in a public-school setting. See School Dist. of Abington Township, Penn. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (finding daily readings from Bible to violate Establishment Clause); Brown v. Woodland Joint Unified Sch. Dist., 27 F.3d 1373 (9th Cir.1994) (finding use of books discussing witches and magic not to constitute Establishment Clause violation); Grove v. Mead Sch. Dist. No. 354, 753 F.2d 1528 (9th Cir.1985) (finding assignment of The Learning Tree not to violate Free Exercise or Establishment Clauses). The principles developed for purposes of the Establishment and Free Exercise Clauses are peculiarly suited to the particular problems they address and are not readily transferrable to other categories of problems, including the at-least-as important but substantially different problems that arise under the Fourteenth Amendment. Thus we neither borrow from nor seek to affect the rules and doctrines that courts have developed to deal with school materials alleged to be in violation of either of the Religion Clauses. We do note, however, that our reasoning is in large measure consistent with that in the Religion Clause cases. See, e.g., Brown, 27 F.3d at 1379 ("If an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee.' "); Grove, 753 F.2d at 1543 (Canby, J., concurring) ("In short, distinctions must be drawn between those governmental actions that actually interfere with the exercise of religion, and those that merely require or result in exposure to attitudes and outlooks at odds with perspective prompted by religion.")
 
 
 [7]
 The amended complaint alleges that Monteiro does not seek the removal of the works "from classroom discussions in which Jane Doe and other African American students were not held as a captive student audience or consigned to a separate and unequal educational environment." The purported qualification does little to lessen the constitutional concerns. Indeed, it exacerbates them. Thus, we do not accept the implied exception as a feasible alternative. First, due to the practical burdens, schools would be unlikely to choose to teach alternate works separately to students objecting to a portion of the curriculum. Instead, they would probably simply remove books that they believed to be educationally valuable, but that might be controversial, or offensive to some. Even more important, the proposed alternative of creating a separate but equal "educational environment" for African-American students would amount to de facto segregation that runs contrary to the dictates of Brown v. Board of Educ. Thus, we view Monteiro's request for relief, regardless of its asserted qualification, as calling for the removal of the challenged literary works from the classroom
 
 
 [8]
 Pratt noted that the flow of information to students through the curriculum is far more direct than through the placing of materials in a library and that accordingly the First Amendment harms stemming from curriculum censorship are by far the more serious injury. It recognized that "[w]hat is at stake is the right to receive information and to be exposed to controversial ideas--a fundamental First Amendment right. If these films can be banned by those opposed to their ideological theme, then a precedent is set for the removal of any such work." 670 F.2d at 779
 Pratt was decided prior to the Supreme Court's decision in Pico, although it does refer to the lower court decision. Its reasoning, however, is consistent with that of the Pico plurality.
 
 
 [9]
 In Sullivan, the Supreme Court recognized the inherent dangers of attaching civil liability to conduct that comes within First Amendment protection. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. In holding that proof of actual malice was necessary in a state law libel action, the Court stated that, "the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive." Id. at 278, 84 S.Ct. 710. The Court soon imposed the heightened proof requirement it imposed in Sullivan in other actions that also raised First Amendment concerns. See Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (applying standard of reckless or knowing falsehood to state law right-of-privacy action)
 
 
 [10]
 The difficulty of finding educational material that is not offensive to a given group has also been recognized in the context of Free Exercise challenges:
 Authorities list 256 separate and substantial religious bodies to exist ... in the United States.... If we are to eliminate everything that is objectionable to any of these warring sects or inconsistent with any of their doctrines, we will leave public education in shreds. Nothing but educational confusion and a discrediting of the public school system can result....
 People of Illinois ex rel. McCollum v. Board of Educ. of Sch. Dist. No. 71, Champaign County, Illinois, 333 U.S. 203, 205, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (Jackson, J., concurring).
 
 
 [11]
 See Maryland Schools Remove 2 Black-Authored Books, L.A. Times, Jan. 11, 1998, at A6 (discussing removal of Toni Morrison's Song of Solomon and Maya Angelou's I Know Why the Caged Bird Sings due to parental complaints that they were "trash" and "anti-white"); Jaime Marernee, Board to Take "Bird" Off List, St. Petersburg Times, June 2, 1998, at 1, available in 1998 WL 4266235 (reporting on parent effort to remove Angelou work from library). Other works by Black authors have been the target of such efforts. See, e.g., Rebecca Sausner, Burlington Board Removes Book on Apartheid, Hartford Courant, Jan. 14, 1997, at A8 (Kaffir Boy by Mark Mathabane); Tim Blangger, To Read or Not to Read, Book Battles Occur More in Schools Than Libraries, Allentown Morning Call, September 30, 1996, at 1, available in 1996 WL 10449017 (Native Son by Richard Wright and The Color Purple by Alice Walker); Bonnie Henry & Roderick Gary, Students Place Language Into Historical Context, Arizona Daily Star, July 21, 1995, at 1A (The Ways of White Folks by Langston Hughes)
 
 
 [12]
 By giving these examples, we do not imply that the writings of these authors (with the possible exception of The Merchant of Venice ) have ever given offense to the same degree as the epithet set forth in Monteiro's amended complaint. We recognize that the term "nigger", as applied to blacks, is uniquely provocative and demeaning and that there is probably no word or phrase that could be directed at any other group that could cause comparable injury. At the pleading stage, however, it would be quite simple for a group or individual to claim that a particular term or idea is profane, insulting, and derogatory, or otherwise highly offensive or injurious, and to seek to proceed to trial on that basis
 
 
 [13]
 Although the complaint does not refer to the involvement of teachers in the teaching of the literary works at issue or in the formation of the curriculum, it is likely that claims such as these, and their outcomes, could have significant effect on the First Amendment rights of teachers. See Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) ("It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years."); Keyishian v. Board of Regents of Univ. of State of New York, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967) (finding that freedom of expression of teachers was a "special concern of the First Amendment"); see also Boring v. Buncombe County Bd. of Educ., 136 F.3d 364, 379 (4th Cir.1998) (Motz, J., dissenting) (noting that teachers enjoy limited First Amendment protections in the classroom)
 
 
 [14]
 J. Whyatt Mondesire, president of the Philadelphia N.A.A.C.P. opposed his group's challenge to Huck Finn, because "[i]t's part of American folklore and history ... You're not going to learn anything by closing your eyes and not reading." Robert Moran & Connie Langland, Pennsylvania NAACP Opposes "Huck Finn" Requirement, Buffalo News, Feb. 2, 1998, at A7
 
 
 [15]
 We do not address the district court's denial of class certification. That order was based upon allegations made in the original (rather than in the amended) complaint. We instruct the district court to determine whether class certification is appropriate under the amended complaint at the appropriate time