Adam **BINGHAM**, Plaintiff,

v.

**OREGON SCHOOL ACTIVITIES ASSOCIATION, Wes Ediger in his official and individual capacities, Defendant.**

No. Civ. 98–6282–TC.

United States District Court, D. Oregon.

March 11, 1999.

Martha Lee Walters, Walters Romm & Chanti, Eugene, OR, for Adam Bingham, plaintiff.

Don G Carter, Barry L. Groce, McEwen Gisvold Rankin Carter & Streinz, Portland, OR, for Oregon School Activities Association, defendant.

Don G. Carter, Barry L. Groce, for Wes Ediger, defendant.

## ORDER

COFFIN, United States Magistrate Judge.

Plaintiff filed discrimination claims in state court pursuant to Title II and Title III of the Americans with Disabilities Act (ADA), the Rehabilitation Act, 42 U.S.C. § 1983, and state statutory and constitutional law.

Defendants removed the action to federal court. A preliminary injunction in favor of plaintiff issued on October 22, 1998. Defendant Ediger then was dismissed from the case, and the matter was tried to the court on February 3, 1999. At the conclusion of trial, the court allowed the parties an opportunity to file supplemental briefing on certain issues. The briefing was completed on March 5, 1999. This written order expands on the court's oral findings of fact and conclusions of law rendered from the bench at the conclusion of the trial. To the extent there are any inconsistencies between this written order and the oral findings, the written order is controlling.

## BACKGROUND

Adam Bingham grew up in Florida, and moved to Oregon during his junior year of high school. While in Florida, Adam's parents became concerned about their son's academic difficulties. They consulted with a physician when Adam was in the

sixth grade, who diagnosed him as having a learning disorder, specifically Attention Deficit Disorder (ADD).[1]

Adam enrolled for his freshman year at Hollywood Christian High School. He did not play interscholastic sports that year, which was the 1994–95 school year. Plaintiff did participate in athletics in his sophomore year, the 1995–96 school year. While he had only limited success at sports, his family, teachers and physician thought Adam benefitted academically from that participation. Further, it was decided that Adam should be held back a grade, that is, repeat his sophomore year of high school. His parents were concerned that his poor academic progress would limit their son's choices and opportunities throughout his life. In order to mitigate any social stigma associated with repeating a grade, Adam's parents decided, after consultation with their family physician, to transfer Adam to Cardinal Gibbons High School for the 1996–97 school year. Adam played football and wrestled while at Cardinal Gibbons.

Adam's family moved to Oregon in 1997, and he enrolled at Marshfield High School for his junior year. Adam played football and wrestled at Marshfield. At the end of his junior year (1997–98 school year) he had participated in high school athletic programs for six semesters, even though he had attended eight semesters of school.

The Marshfield administration did not realize that Adam had repeated his sophomore year of high school, even though his transcripts had been sent to Marshfield when he enrolled. A school counselor finally made this discovery during a routine check of Adam's school credits for graduation, and the counselor alerted the principal.

The principal met with plaintiff's father, the school counselor and the athletic director. The group discussed Adam's progress toward graduation[2] and his eligibility for school athletic programs. All the meeting participants understood that athletics provided Adam with motivation to stay in school and work hard at his studies. Adam's extra year in high school resulted in a violation of the Oregon School Activities Association's (OSAA) "eight semester" rule, which limits a student's athletic eligibility to eight consecutive semesters of high school. Whether or not the student actually participates in athletic programs during the eight semesters does not affect application of the rule.

Mr. Bingham asked about a waiver for Adam, and the group discussed hardship waivers and possible waivers available to learning disabled students. Mr. Bingham explained Adam's earlier ADD diagnosis and the reasons for his repeating the 10th grade. The counselor suggested testing Adam for an Individualized Education Program (IEP) under the Individuals with Disabilities Education Act (IDEA). As set forth in more detail below, the OSAA has special waiver procedures for its eligibility requirements available for students with IEP's, although these waivers are limited to rules other than the Eight Semester rule.

Adam was evaluated and found qualified for an IEP. Once the IEP was in place, Marshfield sought a waiver of the eight semester Rule based on Adam's learning disability. Documentation of Adam's learning disability was presented to OSAA.

Wes Ediger, the Executive Director of OSAA denied plaintiff's waiver request. Plaintiff appealed the decision to the Executive Board of OSAA, which affirmed Ediger's determination. Plaintiff then filed this lawsuit, which defendant removed to federal court.

---

1. ADD and Attention–Deficit/Hyperactivity Disorder (ADHD) are used interchangeably.

2. Adam lacked specific classes required for graduation. Those classes were offered sequentially, so that he needed to attend both the fall and spring semesters to complete the required classes.

## THE AMERICANS WITH DISABILITIES ACT

Plaintiff brings his ADA claim under two separate subchapters of the Act, Title II and Title III.

Title II of the ADA, prohibits public entities from denying benefits to "qualified individuals with a disability." 42 U.S.C. § 12131. Public entities include "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

Title III defines a private entity as "any entity other than a public entity (as defined in § 12131(1) of this title)." 42 U.S.C. § 12181(6). Private entities cannot deny any individual the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). A place of public accommodation includes "a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education." 42 U.S.C. § 12181(7)(J).

Both Title II and Title III require the public or private entity to make reasonable modifications to allow participation by disabled individuals who are otherwise qualified.

■ To prevail on an ADA claim, a plaintiff must show that (1) the ADA applies to the entity (in this case, the OSAA); (2) the plaintiff is disabled under the ADA and has been denied benefits because of his or her disability; (3) the plaintiff is otherwise qualified for the program or service; and (4) that the defendant can make reasonable modifications to its rules, programs or policies to allow participation by plaintiff.

In this case, defendants claim that the ADA does not apply to the OSAA, and deny that plaintiff is either disabled or otherwise qualified under the ADA. Defendants also deny that any reasonable modification exists to accommodate plaintiff.

### 1. The OSAA is Subject to the ADA

■ As noted in the order granting preliminary injunctive relief,[3] the OSAA is an organization whose membership consists entirely of public (226) and private (52) secondary schools. The membership schools have delegated rule-making authority to OSAA as to the area of their athletic competitions. OSAA is nothing more nor less than a collective entity of membership schools—most of them public—empowered to make rules governing interscholastic athletic competition among its constituent members.

Although the OSAA describes itself as "a private, non-profit corporation formed in 1918 for the purpose of coordinating and regulating interscholastic activities,"[4] the Oregon courts have ruled that the OSAA is a "state actor." *See Josephine County School District v. OSAA,* 15 Or.App. 185, 195, 515 P.2d 431, 436 (1973); *Cooper v. OSAA,* 52 Or.App. 425, 429–30, n. 6, 629 P.2d 386, 389 (1981) (holding that OSAA is an agent of its member schools and further reiterating that "administration of high school athletics by OSAA [is] 'state action' within the meaning of the Fourteenth Amendment").

Furthermore, OSAA's reliance on *National Collegiate Athletic Ass'n. v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), in arguing that it is not a public entity is misplaced. *Tarkanian* was a § 1983 case[5] wherein the Court was asked to determine whether the NCAA acted under "color of state law." The Supreme Court read "state law" as the law of a single state. Because NCAA member schools were from all fifty states, and the vast majority of those institutions

3. *Bingham v. OSAA,* 24 F.Supp.2d 1110 (D.Or.1998).

4. Court document # 63, page 4.

5. Although *Tarkanian* was not an ADA case, defendant is correct that any organization acting under color of state law is a public entity under the ADA.

were located in states other than Nevada, the Court found that the "NCAA is not Nevada," *Id.* at 193, 109 S.Ct. 454, and therefore not a state actor.[6]

The Court's holding that the NCAA was not a state actor for § 1983 does not mean that the NCAA would not be a "public entity" under the ADA. A public entity is defined as "any department, agency, special purpose district, or other instrumentality of a State or States." 42 U.S.C. § 12131(1)(B). The specific reference to "States" in the plural distinguishes the ADA from a § 1983 action.

In this case, the OSAA receives its authority to act from the state of Oregon through two separate statutes, and its actions are so inextricably linked with state law as to leave no doubt that it is a public entity.

The Oregon legislature created the State Board of Education (The Board), which establishes policy "for the administration and operation of the public and secondary schools and public community colleges in the State of Oregon." ORS 326.011.

The Board functions are specified in ORS 326.051, which states:

(1)In addition to such other duties as are prescribed by law and pursuant to the requirement of ORS 183.310 to 183.550, the State Board of Education shall:

. . .

(d) Adopt rules regarding school and interscholastic activities in accordance with standards established pursuant to paragraph (f) of this subsection.

(e) Adopt rules that provide that no public elementary or secondary school shall discriminate in determining participation in interscholastic activities. Discrimination is as defined in ORS 659.150.

(f) Adopt standards applicable to voluntary organizations that administer interscholastic activities as provided in ORS 339.430.

While the legislature granted the Board general rule-making power, it also limited the Board's discretion to delegate authority to voluntary organizations by enacting ORS 339.430, which states:

(1) Voluntary organizations that desire to administer interscholastic activities shall apply to the State Board of Education for approval. The state board shall review the rules and bylaws of the voluntary organization to determine that they do not conflict with state law or rules of the state board. If an organization meets the standards established under ORS 326.051 and its rules and bylaws do not conflict with state law or rules of the state board, the state board shall approve the organization. An approved organization is qualified to administer interscholastic activities.

. . .

(3) A voluntary organization's decisions concerning interscholastic activities may be appealed to the state board, which may hear the matter or by rule may delegate authority to a hearings officer to hear the matter and enter a final order pursuant to ORS 183.464(1). Such decisions may be appealed under ORS 183.484.

Therefore, the legislature has empowered the Board to delegate rule-making to voluntary organizations, but has also required the Board to review and approve all such rules and bylaws. The Board adopts those rules pursuant to ORS 326.051(1)(d), and must hear any appeal of OSAA eligibility decisions. The Board decisions are in turn subject to judicial review under the Oregon Administrative Procedures Act, ORS 183.480 through ORS 183.500.

Thus, the OSAA exercises rule-making authority properly delegated to it by the Board. Under these circumstances, the OSAA is an "other instrumentality of a

---

**6.** The Court noted that the "situation would, of course, be different if the membership consisted entirely of institutions located within the same State, many of them public institu-tions created by the same sovereign." *Id.* at 194, fn. 13, 109 S.Ct. 454. That is precisely the situation here.

State" 42 U.S.C. § 12131(1)(B), and is a public entity under Title II of the ADA.

The OSAA also appears to be a public entity pursuant to ORS Chapter 332, which is a grant of power for creation of district school boards. ORS 332.002 et seq. District school boards have control of the district schools, ORS 332.072, and may

> (e) Authorize the school district to be a member of and pay fees, if any, to any voluntary organization, approved under ORS 339.430, that administers interscholastic activities or that facilitates the scheduling and programming of interscholastic activities. ORS 332.075(1).

Responsibility for the OSAA eligibility decisions is attributed to the member school districts by administrative rule. An OSAA eligibility decision, which is a "final determination" under OAR 581–021–0034(1)(c), is defined as a "conclusive ineligibility ruling by a school district or, if the school district has empowered a voluntary association to make such rulings, a conclusive ineligibility ruling by a voluntary association described in ORS 332.075(6)."[7] OAR 581–021–0035(1)(a). This confirms that the OSAA acts pursuant to a delegation of authority from the school district boards as well as the State Board of Education. The OSAA is therefore an agent of the member schools, and a public entity as an "other instrumentality of ... a local government." 42 U.S.C. § 12131(1)(B).[8]

Finally, the Ninth Circuit has joined "[e]very court to consider the question" in concluding that "associations like the [OSAA] are so intertwined with the state that their actions are considered state action." *Clark v. Arizona Interscholastic Association*, 695 F.2d 1126, 1128 (9th Cir. 1982).

In sum, OSAA is a public entity and, as such, is subject to and must comply with the provisions of the ADA in regulating high school interscholastic competitive events. The OSAA may not promulgate eligibility or other rules governing competition which discriminate against the disabled, any more than its member schools could promulgate such rules. The member schools cannot remove themselves from the reach of the ADA by delegating rule-making authority to an agent, as the agent stands in the shoes of the schools. As Wes Ediger, the Executive Director of the OSAA, candidly admitted at trial, he (and the OSAA) work for and under the direction of the membership schools.

**2. *Plaintiff is Disabled Under the ADA***

■ Under the ADA, an individual is disabled if he has a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A)(B). "Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "The term substantially limits means:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1)."

Factors to be considered in determining substantial limitation include the nature

---

**7.** The OAR citation to the statute should be ORS 332.075(e).

**8.** Because the OSAA is a public entity, Title III does not apply. *Rhodes v. Ohio High School Athletic Assn.*, 939 F.Supp. 584, 589 (N.D.Ohio 1996); *Sandison v. Michigan High School Athletic Assn.*, 64 F.3d 1026, 1029 (6th Cir.1995). But OSAA cannot avoid the ADA simply because its membership includes private schools. The private schools are voluntary members and participate in OSAA rule-making, they are expressly subject to the ADA themselves under Title III, and OSAA's identity as a public entity is independent of the private schools.

and severity of the impairment, as well as its expected duration and permanent or long-term impact. 29 C.F.R. § 1630.2(j)(2). Because the factors to be considered are fact specific, such decisions must be made on a case by case basis.[9] *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir.1995). "On the facts of a specific case, a plaintiff diagnosed with ADHD may have a mental impairment within the meaning of the statute." *Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141, 155 (1st Cir.1998).

Adam Bingham has manifested problems with learning since early in elementary school (third grade). When plaintiff was in the 6th grade, his problems with school work caused his pediatrician to refer him to an expert in the area of learning disabilities (Dr. Parker), who diagnosed plaintiff as having ADD and who prescribed Ritalin as part of his treatment.

As Adam's academic problems continued with his disorder, the family physician recommended that plaintiff repeat the 10th grade, which his parents did while transferring him to another private school in Florida, as described above.

After the family relocated to Oregon and transferred to Marshfield, he was diagnosed by the special education team at Marshfield as learning disabled and placed on an IEP. Plaintiff was further tested by Dr. Darryn Sikora, a neuropsychologist, who determined that Adam had normal intellectual ability but had a "moderately severe" defect or learning disability in the "executive functions" area—i.e., a higher cognitive skills area involving the organization of material, the speed by which learned material is processed and retrieved, and the ability to understand and summarize material. Because of his learning disability, Adam has particular difficul-

ty with the visual mode of learning (i.e.reading) and with organizing complex information.

Dr. Sikora's diagnosis was buttressed by the testimony of Dr. Barbara Bateman, who has a doctorate in special education and who has worked with learning disabled students for the past 42 years. Dr. Bateman confirmed that plaintiff suffered from a severe discrepancy between his ability (measured by his intelligence) and his achievement in school, and that this discrepancy was caused by a learning disability in the area of organizational and conceptual skills, and in the area of expressing in written form his higher thought processes. In summary form, Dr. Bateman described plaintiff's disability succinctly:

The average person doesn't rank 210th out of 256 in their class. And Adam, we would predict that Adam, given his intelligence, that Adam would be above average in the class ranking, instead of being almost at the bottom.

I would say that everything that I have seen about Adam, from family history to excessive crying in infancy, through his beginning academic struggles in primary grades, his grades themselves, his standardized test performance, his teachers' comments, everything to me suggests that indeed he has a learning disability. He is impaired, both compared to the average person, and compared to his own ability, which is what makes it even harder for him than if his ability were as low as his achievement in written expression and some other areas. (Tr. Transcript).

Defendant cites several cases which address learning disabilities in the context of employment to support its argument that plaintiff is not disabled within the meaning of the ADA. The inability to perform one

---

9. Because the severity of the condition is specific to the individual, ADD has been found to be a disability within the meaning of the ADA by some courts, *see Criado v. IBM Corporation*, 145 F.3d 437, 442 (1st Cir.1998); *Guckenberger v. Boston University*, 974 F.Supp. 106 (D.Mass.1997); *Menkowitz v. Pottstown Memorial Medical Center*, 154 F.3d 113 (3rd Cir.

1998); *Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432 (6th Cir.1998); *DeBord v. Board of Education of the Ferguson–Florissant School District*, 126 F.3d 1102 (8th Cir.1997), while other courts have found that it is not. *See Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499 (7th Cir.1998).

particular function of a job while retaining the ability to work in general does not substantially impair a major life function. For example, a learning disability that impairs certain job training may not substantially impair the overall ability to work. *Leisen v. City of Shelbyville,* 968 F.Supp. 409 (S.D.Ind.1997). Likewise, being unable to perform one function of a specific job within a general range of employment, such as a registered nurse being unable to lift patients, may not preclude the individual from being able to find other employment as a registered nurse. *Thompson v. Holy Family Hospital,* 121 F.3d 537 (9th Cir.1997).

But these employment cases do not easily transpose to the high school educational environment, where the entire focus is on the major life activity of learning—and not just learning in a narrow area, but in the area of all core curriculum requirements. A disability that may not substantially limit one's ability to work or learn specific job skills may at the same time severely limit one's ability to master and learn complex and multiple subjects in a progressive educational setting. In the context of pursuing his education through the high school level, Adam Bingham is substantially limited in the major life activity of learning because of his learning disability. *See Bercovitch v. Baldwin School, Inc.,* 133 F.3d 141, 155 (1st Cir.1998) ("On the facts of a specific case, a plaintiff diagnosed with ADHD may have a mental impairment within the meaning of the statute"); *see also* footnote 9, above.

### 3. Plaintiff is a "Qualified Individual" Under the ADA; Waiver of the Eight Semester Rule is a Reasonable Modification for a Learning Disabled Student Under the ADA

The next steps in the analysis essentially represent two sides of the same coin—i.e.,

whether plaintiff is a "qualified individual with a disability" and/or whether waiver of the eight semester rule constitutes a "reasonable modification" under the ADA to accommodate his disability.

A qualified individual with a disability is an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. 42 U.S.C. § 12131(2).

■ The language of the statute does not require a plaintiff to meet *every* eligibility requirement for the program or activity from which he has been excluded, but only the essential eligibility requirements.[10]

■ In this case, plaintiff does not meet the eight semester eligibility requirement. Defendant argues that this is an essential eligibility requirement, and the only possible modification, waiver of the requirement, is not reasonable. OSAA initially contended that the purpose in enforcing the eight semester rule is threefold: 1) to ensure safety; 2) to promote competitive fairness; and 3) to encourage students to graduate in four years. *Bingham v. Oregon School Activities Association,* 24 F.Supp.2d 1110, 1113 (D.Or.1998). At trial, a fourth purpose was advanced—i.e., to ensure that all students had an equal opportunity to participate in interscholastic competition and that no one receive a greater opportunity at the expense of another student who may be displaced by the extra opportunity granted the plaintiff.

The eight semester rule is one of several eligibility rules of the OSAA. A determina-

---

**10.** Further, even if plaintiff does not meet some essential requirement, he is still qualified if a reasonable modification to the rule would enable him to meet the requirement. *School Board of Nassau County v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); *Pottgen v. Missouri State High School Activities Association,* 40 F.3d 926 929 (8th Cir.1994); *Kaltenberger v. Ohio College of Podiatric Medicine,* 162 F.3d 432, 435 (6th Cir.1998).

tion of whether the eight semester rule is "essential", or whether a waiver of this rule is a "reasonable modification", should not be undertaken in isolation but in the context of other eligibility rules, the purposes and policies underlying those rules, and OSAA's own practices in waiving the rules under specific circumstances.

The various rules regulating individual eligibility are found in Rule 8 of the OSAA Handbook.[11]

Rule 8–1 sets minimum attendance and grade requirements for eligibility:

**8–1 Attendance–Semester–Grades:**
An eligible student must be enrolled full time as defined in this rule. For purposes of this rule, a full time student is one who is enrolled in school, attending regularly and passing in subjects equivalent to at least five (5) semester units of work, and who during the immediate preceding semester was enrolled in school, attended regularly and passed subjects equivalent to at least five (5) semester units of work. NOTE: Two semester units equals one credit of work, and one-half semester credit is granted each semester.

**8–1–1** In addition to the specific credit requirement identified in Rule 8–1, to be scholastically eligible, a student must be making satisfactory progress towards the school's graduation requirements as determined by the local school administration.

**8–1–2** A semester, as used in these Rules, is one-half of the regular school year.

**8–1–3** Where a student is enrolled in a high school and receiving credit at that high school for off-campus college classes, work experiences or other school-approved educational activities (including summer school or night school) where regular attendance is required, the school may count those credits earned off-campus for the purposes of determining individual eligibility.

The purpose of the attendance-grade rule is obvious and salutary: a student attends high school primarily to obtain an education, not to play sports, and the student's educational performance should reflect minimum progress towards that objective. Participation in athletics is an incentive to the achievement of that minimum standard of academic performance.

But the academic-grade eligibility rule admits of express exceptions, listed in Rule 8–1–4. One of those exceptions, of particular force here, applies to the learning disabled:

Any student who has an Individualized Educational Program (IEP) who did not earn at least five credits in the immediate preceding semester or who is not currently earning five credits and/or who has not been attending school regularly due to his/her handicapping condition may still be eligible to participate if the student's multidisciplinary team determines that the student is making adequate educational progress towards meeting his/her IEP goals and objectives.

The exception recognizes that the purpose of the attendance-grade eligibility rule is not frustrated if a student fails to meet the minimum requirement because of a learning disability. In that instance, OSAA defers to the student's multidisciplinary team to determine if the student is nonetheless making adequate educational progress within the confines of his or her IEP.

Rule 8–3 limits eligibility based upon a student's age:

**Age:** A student who becomes nineteen (19) before August 15 shall become ineligible for interscholastic competition. A student who becomes nineteen (19) on or after August 15 shall remain eligible for that entire school year.

---

**11.** The rules cited below are from Trial Exhibit 278 (OSAA Handbook), pages 9 through 22.

The age rule admits of express exceptions, including an exception for the learning disabled:

Rule 8–3 (regarding age) shall not be waived by any individual or group of the Association. However, the Executive Board, or as it may provide, the Executive Director, may in individual cases, upon written request and after a hearing, declare eligible to participate in interscholastic athletics a student who would otherwise be ineligible under Rule 8–3 (regarding age) if:

(a) The student entered school later than others of the student's age as a result of having been determined to be handicapped under Public Law 94–142, or was retained prior to the sixth grade as a result of having been determined to be handicapped under Public Law 94–142.

(b) There is satisfactory evidence that the student's participation would not constitute a risk to the safety and health of other participants. Without limiting the evidence that may be considered, evidence of the student's past athletic performance and the student's size and weight in comparison to other contestants in the sport may be considered in determining whether the student's participation would constitute a risk to the safety and health of other participants.

A decision of the Executive Board may be appealed to the State Superintendent of Public Instruction under OAR 581–21–033.

The exception contains an irrational subpart. A learning disabled student may be granted a waiver of the age rule, but only if the student was retained (i.e., repeated a grade) "prior to the sixth grade."

At trial, Wes Ediger observed that the reference to the sixth grade is probably an error, and the exception actually applies to students retained prior to the "eighth grade."

Even with this adjustment, there appears to be no rational basis for requiring a learning disabled student to be retained because of his/her disability prior to the eighth grade as a precondition to a waiver of the age rule. No evidence was offered which would explain a distinction between a disabled student retained prior to high school as opposed to one who is retained while in high school. Both run afoul of the age rule for the same reason—their learning disabilities caused them to repeat a grade. To grant one an exemption and not the other artificially and unreasonably distinguishes between them based upon the chronological time period in which their disability manifested itself in the form of having to be retained. The only discernible basis for limiting the exception from the age rule to pre-eighth grade retained students is to complement the eight semester rule, which I will address shortly. Before ending the analysis of the age rule, however, it should be noted that each of the stated purposes of the eight semester rule is invoked—indeed with perhaps even stronger force—by the age rule. Competitive fairness and safety issues would seem to be of greater concern with older students, who are physically more mature and stronger. The specter of red-shirting can be raised just as easily (did the parent hold the student back in the 7th grade with an eye towards him being in a better position to get an athletic scholarship to college because of his athletic prowess as a 19 year old senior?). And the prospect of displacing another student is the same regardless of which rule of eligibility is being waived (whether it is the grade rule, the age rule, or the eight semester rule). Nonetheless, as noted, OSAA does expressly provide for a waiver of its age rule for learning disabled students. Such is not the case with the eight semester rule.

The eight semester rule is found in Rule 8–2, which provides:

**Duration of Eligibility/Graduation:** A student may participate in the interscholastic program for four consecutive years (eight semesters or the equivalent) after entering the ninth grade. Howev-

er, a student becomes ineligible thereafter upon graduation from high school.

Unlike the grade and age rules, there are no listed express exceptions to the eight semester rule. However, there is a catch-all exemption from all eligibility rules vested in the discretion of the Executive Board of OSAA pursuant to Rule 8–9–3, which states:

The Executive Board, or as it may provide, the Executive Director, in individual cases may, at its discretion, and upon terms and conditions as it may impose, waive or modify any eligibility rule ... when in its opinion there are circumstances beyond the control of the student or parent or other circumstances whereby enforcement of the rule would work an undue hardship upon the student.

In such cases, the decision of the Executive Board may be appealed to the State Superintendent of Public Instruction under OAR 581–21–033. *Id.*

The Handbook has an explanatory section entitled Executive Board Policies, which sets forth the following criteria for waiver of the eight semester rule pursuant to a Rule 8–9–3 hardship application:

**Eligibility—Fifth Year Criteria**

It is the intent of the OSAA that a student graduate within eight semesters and that additional eligibility be granted only in extraordinary *circumstances*. When interpreting and applying OSAA Rule 8–9–3 in cases where a student requests more than eight semesters of eligibility, the Executive Board or the Executive Director may consider the following factors, among any others deemed relevant to the determination of whether additional eligibility should be granted. **Any one of these criteria may be a basis for denial.**

1. whether the circumstances cited by the student, which made the student unable or ineligible to participate, were created by factors beyond the student's control;

2. the length of time a student was unable or ineligible to participate;

3. the number of activities (seasons, games, competitions, events) in which the student was unable or ineligible to participate;

4. the number of activities in which the student was able to participate, or in which the student did participate, during his/her eight semesters of eligibility;

5. whether the student was able to participate in similar activities during the time that she/he was unable or ineligible to participate in the particular OSAA activity;

6. the possibility that the student's eligibility for more than eight semesters could pose a danger to other students;

7. the likelihood that the student's eligibility for more than eight semesters will give the student or the student's team a competitive advantage;

8. the likelihood that the student's eligibility for more than eight semesters will deprive other students of the opportunity to participate in the activity, or limit other students' participation in the activity;

9. whether the student was otherwise able to progress academically during any period of ineligibility; and/or

10. whether the student has provided medical or other professional evidence substantiating the condition giving rise to the loss of opportunity to participate.

At trial, the plaintiff offered evidence of a number of students who applied for waivers of the eight semester rule from OSAA. The names of the students were deleted from the exhibits to protect their privacy, and I will summarize the cases of those who received waivers in general terms:

1. A North Bend student who had emotional and family problems that caused him to drop out of school and abuse drugs for a period of time. He subsequently

sought treatment, re-entered school, maintained his sobriety, and had his eligibility restored.

2. A South Eugene student who spent two semesters attending school in Thailand on an exchange program and who was not yet 19 when he returned for his 5th year at South.

3. Another South Eugene student who dropped out of school for two semesters because of depression over the divorce of his parents.

4. A Parkrose student who became a ward of the Oregon Youth Authority following a shooting incident and who dropped out of school while confined at a juvenile facility, and who successfully completed a drug and alcohol program there.

5. A Putnam student hospitalized for a lengthy period after a serious automobile accident.

6. A North Medford student who dropped out of school for a year to care for his terminally ill father.

7. A Sherman High School student who had missed a year of school because of depression associated with family problems (criminal charges against his father and his parents' divorce).

8. A Cottage Grove student whose attendance in school was sporadic his fourth year such that he had to come back for a 5th year to earn enough credits to graduate, who had a troubled home life and a mentally disturbed mother, and who benefitted greatly in terms of incentive and self-esteem through participation in athletics.

9. A Willamette student who dropped out of school in his junior year because of depression caused by severe abuse problems in the family.

10. A Powers student who was a former drug addict with sporadic prior school attendance, whose parents were both drug abusers, and whose mother was incarcerated. She became clean and sober and re-entered school to obtain a diploma as a 5th year senior.

11. A West Linn student whose exemption request was initially denied by the Executive Director but subsequently approved by the Executive Board. The student had not missed any schooling but his academic progress was interrupted by problems caused by drug use and gang membership, necessitating a 5th year to earn enough credits to graduate. School officials verified that the student's participation in athletics was a strong motivation for him to stay drug free, remove himself from the gang environment, and succeed academically.

12. A Wilsonville student who opted to drop out of school his junior year because of lethargy, that was subsequently diagnosed as being caused by seasonal affective disorder. As related by his physician, "[i]t was [the student's] decision to stop going to school and work part-time hoping that his condition would improve from having less stress in the environment."

13. A Newport student who, because of a difference in the scheduling of the school year in the two countries, attended the 9th grade in Australia and repeated the 9th grade upon his return to the United States and thus became a 5th year senior.

14. A Riddle student who, although attending school, received little or no credits towards graduation in her sophomore and junior years because of severe drug and psychological problems. The student completed a drug program and returned for a 5th year.

15. A Triangle Lake student with cystic fibrosis who was allowed to compete in high school competitions beginning in 8th grade because of her love of basketball and the uncertainty of her prognosis. The student went on to complete all four years of high school and was granted a hardship waiver which allowed her to compete for 10 semesters.

16. A South Albany student who missed a year of school and who was thereafter diagnosed as Severely Emotionally Disabled.

17. A Pleasant Hill student who suffered a knee injury and who also experienced depression stemming from an abusive home situation involving his step-father with whom he was residing in another state. The student's father took custody of his son during the school year and relocated him to Oregon, but waited until the following semester to re-enroll him at Pleasant Hill High School. The Executive Director initially determined that there was no medical necessity to withdraw the student from school and not re-enroll him to complete that term, and denied the request. The Executive Board subsequently overruled the Director and granted the exemption, finding the combination of knee injury and depression warranted an extra semester of eligibility.

18. A Roosevelt student who was expelled from school his sophomore year because of lack of attendance and who also withdrew from school during part of his junior year. He since was diagnosed with ADD, returned to school, and began applying himself toward improving his academic performance. The student and his mother asked for the waiver, in part because participation in football was a strong incentive for him to stay in school and do well academically.

19. A Mitchell student who attended school but lacked credits for graduation and who then needed a 5th year because of absenteeism associated with a broken home environment and a drug-dealing father who was imprisoned during her junior year. As with all those granted waivers, athletics was a strong motivator for the student's academic success and self-esteem.

20. The final example of a waiver of the eight semester rule concerned a Jefferson student who dropped out of school for a year because of serious problems at home involving a drug-addicted mother who abandoned him and his siblings.

It is in this context of the grade rule, the age rule, and the documented eight semester rule waivers for individual students, as well as the purpose of the eligibility rules, that I analyze whether the eight semester rule is an "essential" eligibility requirement and/or whether a waiver of that rule is a reasonable modification as a way of accommodating Adam Bingham's disability.

As indicated in the order granting preliminary injunctive relief to plaintiff, the eight semester rule is designed to ensure safety, promote competitive fairness, and encourage students to graduate in four years. At trial, OSAA advocated a fourth basis for the rule—the granting of equal opportunities to all students to participate in athletics and the avoidance of displacement of otherwise eligible students by students given extra eligibility.

These are salutary purposes. On the surface, one is very tempted to accept the OSAA's argument that the eight semester rule is indeed an "essential" eligibility rule.

But an in depth analysis reveals a much closer call. The court cannot reconcile the exceptions grafted into the grade and age rules for the learning disabled with the failure of OSAA to grant a similar exception to the eight semester rule.

It cannot be denied that most of the purposes of the eight semester rule are implicated—with even more force—by the age rule. A 19 year old will present safety and competitive fairness concerns, and an age waiver for him/her will result in the possible displacement of another student on the team. The goal of graduating in four years is laudable, but—as described above—it makes no sense to grant age waivers to learning disabled students who repeated the 7th grade because of their handicap but deny them to those who repeated the 10th grade. High schools do not exist in a vacuum. A student progresses on a continuum from kindergarten through 12th grade. And, as the evidence revealed in the trial, there may be compelling reasons for a learning disabled student to wait until his high school years to repeat a grade: Adam Bingham, for exam-

ple, has always been of a larger physical stature than his classmates. To have repeated a grade at the elementary level wold have exacerbated this difference and contributed to an even lower self-esteem.

Although safety may not be directly implicated by the grade rule,[12] certainly the displacement issue is no different than that underlying the eight semester rule nor is the goal of graduating in four years. Yet OSAA allows an exception for the learning disabled under its grade rule for eligibility.

OSAA failed to present evidence at trial which would explain the "essential" requirement of an eight semester rule admitting of no exceptions for the learning disabled who require extra semesters to graduate because of their disability while having other rules of eligibility which permit such exceptions.

At bottom, OSAA's position boils down to the concept of equal opportunity—everyone is to have an equal shot at eight semesters of high school athletics.

But this narrow viewpoint of athletics ignores the realities of the impact of the rule on those who, through no fault of their own, because they are disabled—find themselves still in high school for a 5th year. Athletics are part of the "goods, services, facilities, privileges, advantages, and accommodations" offered by schools to its students. 42 U.S.C. § 12182(a). Barring a learning disabled student from trying out for the football or basketball team is fundamentally no different than barring him or her from auditioning for the school play, attending the prom, or taking a history class in the interest of giving everyone an equal opportunity of eight semesters to experience all the benefits of high school.

Especially is this so given the background of all the evidence the court heard at the trial. The constant refrain from plaintiff himself, his parents, the educators, the coaches working with him, and the experts in the field of learning disabilities was that participation in athletics is of great assistance in motivating the plaintiff to overcome his handicap, to stay in school, and to perform better academically. Indeed, the clear thrust of the evidence introduced regarding each of the waivers of the eight semester rule that have been granted by OSAA confirms the importance of high school athletics to those who failed to graduate in four years because of drug abuse problems, broken homes, emotional disorders or other personal problems, and how participation in athletics motivated these students to pull themselves together, overcome their difficulties, stay in school, and eventually graduate.

In light of all this evidence and the overall context of OSAA's eligibility rules, I have great difficulty finding that the eight semester rule, as presently drafted without any exception for the learning disabled as contained in the age and grade rules, is an "essential" rule of eligibility.

Even were the court to so conclude, however, plaintiff overwhelmingly established that a waiver of the eight semester rule under the circumstances of his case is a reasonable modification to accommodate his learning disability.[13]

That a waiver is a reasonable modification easily follows from many of the factors discussed previously. To reiterate in summary fashion:

1) The OSAA allows exceptions for other eligibility rules for the learning disabled and the other rules implicate the same concerns and purposes underlying the eight semester rule.

2) There is no rational basis for making a distinction between a learning disabled

---

12. Neither is it directly implicated by the eight semester rule. Adam Bingham was only 18 when he commenced his 5th year of high school. There is no reason to believe that a 9th semester student who is 18 or under presents a safety concern.

13. Once plaintiff establishes that a requested modification is reasonable in the general sense, defendant has the burden of establishing that such would be unreasonable under the specific circumstances of the case. *See Benson v. Northwest Airlines*, 62 F.3d 1108, 1112 (8th Cir.1995).

student who repeats the 7th grade and one who repeats the 10th grade.

3) The evidence established that plaintiff did not repeat the 10th grade in order to red-shirt. He repeated the 10th grade because of a serious learning disability which hampered his academic progress. OSAA's goal of encouraging students to graduate in four years is not frustrated if a learning disabled student does not do so because of his handicap.

4) Adam Bingham, although of large physical stature, does not present a safety risk to other athletes against whom he competes nor does he confer an unfair competitive advantage on Marshfield High School. While on the football team he competed as a reserve against opponents of similar stature; while wrestling he competed against opponents of the same weight class; while competing in track and field he will be participating in a sport at which he has not heretofore competed.

5) OSAA has granted waivers of the eight semester rule to students in the past who failed to graduate after eight semesters because of drug problems, emotional problems, broken homes, juvenile delinquency, and other legitimate reasons. It is unreasonable to grant hardship exemptions for 5th year seniors who present a basis for a waiver that does not amount to a disability, while refusing even to consider a waiver on the basis of a disability under the ADA.

6) Although OSAA cites *McPherson v. Michigan High School Athletic Assn.*, 119 F.3d 453 (6th Cir.1997), for the proposition that requiring it to consider a student's disabilities in conjunction with a waiver request of the eight semester rule would impose an immense and undue, if not impossible, burden on the OSAA, I find *McPherson* to be readily distinguishable, as well as unpersuasive in its reasoning.

Unlike the MHSAA in *McPherson*, here the OSAA already factors in a student's learning disability in granting waivers of

its age and grade rules of eligibility. How can it be deemed an "immense, undue or impossible burden" to require OSAA to factor in the same exception to the eight semester rule?

Further, the *McPherson* court obviously viewed the ADA as a slippery slope and conjured up a parade of horribles:

> The plaintiff would have us require waivers for all learning-disabled students who remain in school more than eight semesters. That, of course, would have the potential of opening floodgates for waivers, while until now, there have been only a handful of cases deemed appropriate for waivers. Assessing one or two students pales in comparison to the task of assessing a large number of students; an increase in number will both increase the cost of making the assessments, as well as increase the importance of doing so correctly. Having one student who is unfairly advantaged may be problematic, but having increasing numbers of such students obviously runs the risk of irrevocably altering the nature of high-school sports. *McPherson*, 119 F.3d at 462–63.

I do not agree that learning disabled students should be viewed with trepidation or looked upon as somehow portending the doom of high school sports. The *McPherson* decision seems to take issue with the fundamental premise ·of the ADA—that the disabled should be accommodated where it is feasible to do so with a reasonable modification of the rules. That there may be few or many qualified individuals with a disability is irrelevant to the reasonableness of a modification. Congress did not say, "make a reasonable modification of your rules if only one or two disabled people might apply for such, but not if fifty or more might quality." [14]

Concerns about manufactured disability claims or the difficulty in making such assessments appear greatly exaggerated

---

**14.** To the extent it matters, evidence presented at trial established that there are 18 5th year seniors at Marshfield. Only one of them, Adam Bingham, has been classified as learning disabled.

given the evidence this court heard at trial. As Dr. Bateman testified, learning disabilities are not manufactured or faked. They manifest themselves through objective criteria and are susceptible to testing. The *McPherson* court's concern that a high school or student might manipulate a learning disability claim for red-shirting purposes is a very flimsy reed on which to reject the proposition that a modification of the eight semester rule can be a reasonable modification for the learning disabled. One might just as well hypothesize that a student might fake depression over family problems, abuse drugs, commit crimes so as to be incarcerated, or join a gang and drop out of school in order to red-shirt and gain an extra year of eligibility.

Furthermore, the mechanism of assessing a student's learning disability is already in place. No additional burden need be imposed on OSAA unless for some reason it chooses to impose a different procedure than it already utilizes to consider waiver of its age and grade rules for the learning disabled: a student is evaluated by his or her special education or multidisciplinary team from the school or school district, determined to be disabled, and placed on an IEP. The school already does the assessment for OSAA with respect to two of its eligibility rules, and it would not constitute any further burden on OSAA to utilize the same process for screening waivers of its eight semester rule for the learning disabled.

Finally, the evidence introduced at trial conclusively established that the purpose of the eight semester rule in encouraging students to graduate in four years may well be in conflict with the best interests of a learning disabled student, who, pursuant to an IEP, may be better served in terms of his or her educational needs by taking 5 years to graduate.

In that vein, perhaps, what is called for here is a fundamental re-thinking by OSAA and its membership schools about the function of high school athletics *vis a vis* learning disabled students who find themselves attending school for a 5th year because of their disability. Especially in the case presented here, where the student does not run afoul of the age rule, does not have a competitive advantage, has not redshirted, and benefits greatly from participation in sports, how can it be said that allowing the student to participate somehow fundamentally alters the nature of high school athletics?

## THE REHABILITATION ACT

■ Section 504 of the Rehabilitation Act provides that no "otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. Section 794(a). Plaintiff's Rehabilitation Act claim is distinguished from the ADA claim by the added element of receiving federal funds.

Plaintiff agrees that defendant does not receive federal funds directly, but argues that the member schools receive federal funds, and those federal funds free up other money that the schools then use to pay their membership fees to the OSAA, and as such, the OSAA receives federal funds. The law is otherwise. In *NCAA v. Smith*, —— U.S. ——, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999), the Court established that payments of dues from recipients of federal funds do not suffice to render the dues recipient subject the Rehabilitation Act.[15] Therefore, the OSAA is not a recipient of federal funds within the meaning of the Rehabilitation Act.

**15.** Although *Smith* was a Title IX case, the Court pointed out that it had earlier equated Title IX eligibility with the Rehabilitation Act in *Department of Transportation v. Paralyzed Veterans of America*, 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986), and relied on that case to find that the NCAA was not subject to Title IX because it received dues from recipients of federal funds.

### 42 U.S.C. § 1983

Plaintiff brings an equal protection claim under 42 U.S.C. § 1983. The Fourteenth Amendment's equal protection clause guarantees that similar individuals will be dealt with in a similar manner by the government. In this case, plaintiff claims that OSAA's eight semester rule discriminates against an identifiable group of individuals, learning disabled high school students, by denying those individuals the same opportunities as students without learning disabilities. As a matter of law, physically or mentally disabled individuals are an identifiable class. When the court reviews a law to determine whether it violates equal protection for the disabled, the test is whether the law bears any rational relationship to a legitimate governmental purpose. *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Clark v. State of California*, 123 F.3d 1267 (1997); *Bartlett v. New York State Board of Law Examiners*, 970 F.Supp. 1094 (S.D.N.Y.1997).

Plaintiff must also prove purposeful or intentional discrimination to prevail on his § 1983 claim. *Gutierrez v. Municipal Court*, 838 F.2d 1031, 1047 (9th Cir.1988) ("Because purposeful discrimination is an essential element of an equal protection clause violation, . . . [plaintiff's] section 1983 claim requires her to prove intentional discrimination"); *Monteiro v. The Tempe Union High School District*, 158 F.3d 1022, 1026 (9th Cir.1998); *Oona, R.–S.–, v. McCaffrey*, 122 F.3d 1207, 1209 (9th Cir.1997). Plaintiff presented no evidence at trial to support a finding of intentional discrimination, and thus I find against plaintiff on his § 1983 claim.

### STATE LAW CLAIMS

Plaintiff brings four claims under state law, including discrimination claims under ORS 659.150, ORS 659.425(3), and under Article I, § 20 of the Oregon Constitution. Plaintiff also seeks judicial review under ORS 183.484.

ORS 183.484(4)(b) states that "The court shall remand the order to the agency if it finds that the agency's exercise of discretion to be otherwise in violation of a . . . statutory provision." Also, the court may remand the case if the agency erroneously interpreted a provision of law and a correct interpretation compels a particular action. ORS 183.484(4)(a). Here, OSAA's decision that the ADA did not apply to its actions requires remand for further action consistent with the terms of equitable relief set forth in the following section of this order.

I decline to exercise jurisdiction over the plaintiff's remaining state law claims in view of my ruling on his ADA claim, which renders it unnecessary to reach such claims.

### CONCLUSION

For the reasons set forth, I find that OSAA is subject to the ADA, that plaintiff is disabled within the meaning of the ADA in the major life activity of learning, that plaintiff repeated the 10th grade because of his disability, and that allowing plaintiff eligibility to participate in athletics as a 5th year senior at Marshfield High School is a reasonable modification of the OSAA's eligibility rules in order to accommodate his disability.

Pursuant to the enforcement provisions of Title II of the ADA, 42 U.S.C. § 12133, and ORS 183.484 to ORS 183.490, the court orders OSAA to:

1) Refrain from using its eligibility rules to deny Adam Bingham eligibility to participate in athletics during the 1998–1999 school year;

2) Refrain from penalizing Marshfield High School or any of its staff or teams for allowing Adam Bingham to participate in interscholastic athletics during the 1998–1999 school year;

3) Rewrite and submit to the court for approval within 90 days the age rule (OSAA Rule 8–3) to eliminate the distinction between a learning disabled student who is retained because of his or her disability prior to the sixth grade and one

who is retained for the same reason during his or her ninth to twelfth grade years;

4) Rewrite and submit to the court for approval within 90 days the eight semester rule (OSAA Rule 8–2) to provide for an exception for learning disabled students, similar to the exceptions in place for such students with respect to the grade and age rules, subject to the modification set forth in paragraph 3; and,

5) Pay reasonable attorney fees and costs to plaintiff for the pursuit of this action.

The court declines to award compensatory or punitive damages to plaintiff. This is a case of first impression, OSAA was not motivated by any discriminatory bias against plaintiff in denying the waiver request, nor did OSAA enforce its eight semester rule with any purposeful intent to discriminate against plaintiff because of his disability.

Finally, the court finds that it is feasible, if not probable, that learning disabled students other than plaintiff may subsequently apply for waivers of OSAA's eligibility rules and accordingly will retain jurisdiction over OSAA until further order of the court to ensure that it continues to comply with the ADA.

The Clerk is directed to enter judgment for plaintiff. The time to file any appeal will commence upon the filing of this order.

SO ORDERED.